FABICK, INC.,

         Plaintiff,         OPINION AND ORDER

   v.

                  16-cv-172-wmc

FABCO EQUIPMENT, INC. and
JFTCO, INC.,

         Defendants.

     This case illustrates some of the perils of going into business with family members, including the obvious risks of intermingling business and personal relationships, but also the less obvious risks associated with using a family name as a trademark. Here, plaintiff Fabick, Inc., asserts claims of trademark infringement under both federal and state common law against defendant FABCO Equipment, Inc., and JFTCO, Inc., based on defendants' use of the "Fabick CAT" name beginning in July 2015. The parties' cross motions for summary judgment are before the court. (Dkt. ##90, 117.) For the reasons that follow, the court will deny both motions, with one exception: defendant FABCO's motion for judgment in its favor on any claim of *direct* trademark infringement.

## PRELIMINARY ISSUES

### I. Motion to Strike Defendants' Affirmative Defenses (dkt. #195)

     In a prior order, the court granted defendants' motion to dismiss count I of plaintiff's first amended complaint and directed plaintiff to file a second amended complaint (dkt. #88), which it did (dkt. #143). In response, defendants filed their respective answers. (Dkt. ##144, 145.) Plaintiff now moves to strike two defenses which

it contends were raised for the first time in the amended answers without leave of court: (1) a fair use defense under 15 U.S.C. § 1115(b)(4), and (2) a fraudulent procurement defense under 15 U.S.C. § 1115(b)(1).

In opposing the motion, defendants contend generally that the motion should be denied solely "because a plaintiff's new complaint wipes away prior pleadings, [and, therefore,] the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses." (Defs.' Opp'n (dkt. #207) 1-2 (quoting *Chasensky v. Walker*, 740 F.3d 1088, 1094 (7th Cir. 2014)).) More precisely, however, *Chasensky* and other cases like it stand for the proposition that in answering the amended complaint, a party may respond to *new* allegations with *new* affirmative defenses. Similarly, if the amended complaint does not contain new allegations giving rise to new defenses, then the defendant must seek leave to amend its answer to add those new defenses. *See generally* 6 Charles Alan Wright, *et al.*, *Fed. Prac. & Proc. Civ.* § 1476 (3d ed.) ("[W]hen the complaint is amended defendant should be entitled to amend the answer to meet the contents of the new complaint.").

With respect to the § 1115(b)(4), plaintiff asserts factual allegations for the first time in its second amended complaint that relate to fair use. (*Compare* 2d Am. Compl. (dkt. #143) ¶ 54 ("FABCO asserts that prior to selling its assets to JFTCO, and in spite of FABCO having previously sold the Fabick stock and the FABICK Marks to Jay Fabick, that FABCO had a common law 'fair use' right to use the 'Fabick' name in FABCO's business operations."), *with* 1st Am. Compl. (dkt. #32) (containing no reference to "fair use").) As

such, the court finds that defendants reasonably added a fair use defense in their respective answers to the second amended complaint.

Defendants' new affirmative defense of fraudulent procurement under 15 U.S.C. § 1115(b)(1), however, presents a different situation. With respect to this defense, defendants do *not* argue that new allegations in plaintiff's second amended complaint open the door to this defense; rather, defendants argue that they "did not have a basis to plead that Plaintiff fraudulently procured its trademark rights at the outset of this case." (Defs.' Opp'n (dkt. #207) 4.) Instead, defendants maintain they only learned of the availability of this defense during Jay Fabick's deposition in this lawsuit, when he purportedly testified that he was award of the prior use of the Fabick mark by the John Fabick Tractor Company. (*Id*.) While perhaps this justified granting leave to amend their respective answers under Rule 15(a)(2), defendants did not seek leave to add this new defense either before or at the time they filed their respective amended answers. Still, the court is reluctant to exalt form over substance, particularly when answering an amended complaint may have seemed a convenient (if somewhat underhanded) opportunity to add this new defense. As such, the court will treat defendants' opposition as a motion for leave to amend their answers to add a defense under 15 U.S.C. § 1115(b)(1).

Typically, leave to amend should be "freely" given. Fed. R. Civ. P. 15(a)(2). Notwithstanding this "liberal attitude towards the amendment of pleadings, courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008) (internal quotation omitted).

Accepting defendants' contention that they did not know of the availability of this defense until Jay Fabick's deposition, the deposition was held on March 14, 2017, while defendants' respective answers were not filed until June 28, 2017, more than three months later. Admittedly, defendants' answers to the second amended complaint were not due until that date, but defendants offer no reason for not seeking to amend more promptly, a particularly poor choice since even defendants concede the fraudulent procurement defense was *not* triggered by new allegations in the second amended complaint. In sum, defendants could have (and should have) sought leave to add this new defense shortly after Jay Fabick's deposition.

Still, three months is not an inordinate delay absent some prejudice to plaintiff, and that is where plaintiff's opposition stalls. *See Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004) ("Delay, standing alone, may prove an insufficient ground to warrant denial of leave to amend the complaint; rather, the degree of prejudice to the opposing party is a significant factor in determining whether the lateness of the request ought to bar filing." (internal citation and quotation marks omitted)). As far as the court can discern, defendants' unclean hands defense touches on the *same* factual allegations as those that would support a fraudulent procurement defense, and other than complaining generally about its need to conduct discovery relative to these defenses, plaintiff has identified no way in which its discovery efforts or trial preparations would be prejudiced by the late addition of this defense. *See generally* 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 31:60 at 31-160 to 31-161 (discussing interplay between

unclean hands defense based on fraud in obtaining registration and a § 1115(b)(1) defense).

For these reasons, the court will deny plaintiff's motion to strike defendants' fair use and fraudulent procurement defenses under 15 U.S.C. §§ 1115(b)(4) and 1115(b)(1), respectively.

## II. Reserved Portion of Motion to Compel (dkt. #211)

Defendants filed a motion to compel discovery or, alternatively, to preclude evidence and argument at trial on advice of counsel. (Dkt. #211.) After hearing argument from the parties on that motion, the court previously: (1) granted it in part by striking plaintiff's reliance on an advice of counsel defense in its summary judgment briefing and precluding certain related testimony at trial; (2) denied it in part by refusing to compel production of one of the categories of privileged documents; and (3) reserved on compelling production of the other category of documents to defendant JFTCO pending additional briefing from the parties. (10/5/17 Order (dkt. #215).) Having now reviewed certain of the withheld documents *in camera* and considered the parties' additional briefing, the court agrees with defendants that FABCO's right to attorney-client privilege transferred at the time of JFTCO's acquisition of substantially all of FABCO's assets. Accordingly, the court will direct plaintiff to produce the "first category" of documents identified in the court's prior order and filed by plaintiff for *in camera* review.

As set forth in defendants' supplemental briefing, a corporation's rights and authority with respect to the attorney-client privilege passes to the new management along with control. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349

(1985); *see also Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 407 (N.D. Ill. 2007) (recognizing that following *Weintraub*, "several courts have recognized that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert or waive the attorney-client privilege" (internal citations omitted)). (*See also* Defs.' Suppl. Br. (dkt. #217) 2-3 & n.3 (citing other cases in support).)

In response, plaintiff does not cite any legal authority to the contrary, but instead argues that any attorney-client privilege attaching to the documents at issue had transferred from FABCO to plaintiff Fabick, Inc., at the time of the 1997 transfer of Fabick stock to Jay Fabick, and therefore had already been lost *before* the 2015 asset acquisition by JFTCO. (Pl.'s Opp'n (dkt. #218) 1.) The argument presumes that the attorney's involved in the creation of these communications from approximately 1993 to 1996 was solely representing Fabick's interest, when in fact the representation was plainly a joint one in which the law firm of Foley & Lardner was acting in the collective interest of two clients -- FABCO and Fabick -- meaning both had the right to the privilege. As a result, in transferring its ownership interests to Fabick in 1997, FABCO only transferred those interests held by Fabick, including Fabick's attorney-client privilege, but *not* that owed to FABCO. Indeed, this is the only way to interpret Foley & Lardner's agreeing to do the work of Fabick, Inc., *and* its far longer-standing, ongoing representation of FABCO, as Fabick's subsidiary entity. This is also the only way to make sense of plaintiff's position that FABCO was intimately involved in the trademark application process by securing

representation by Foley & Lardner and paying the fees and expenses incurred as part of that process. Plaintiff simply cannot have it both ways.[1]

Finally, in its supplemental brief, plaintiff reiterates its argument that even if FABCO retained a *joint* privilege after 1997, it still cannot unilaterally transfer that privilege to a third-party without *Fabick's* consent. True enough, but there are at least two problems with that argument on the facts here. First, JFTCO is not a typical third-party; rather, it sits in FABCO's shoes in light of its acquisition of substantially all of FABCO's assets. The question then is whether Fabick had a reasonable expectation that FABCO would not be allowed to transfer the joint privilege to a successor entity. For the most part, courts have concluded that the privilege transfers to the successor corporation even when that privilege arises out of a joint representation. *See, e.g., 625 Milwaukee, LLC, v. Switch & Data Facilities Co., LLC*, No. 06-C-0727, 2008 WL 582564, at *4 (E.D. Wis. Feb. 29, 2008); *Bass Public Ltd. Co. v. Promus Cos., Inc.*, 868 F. Supp. 615, 619-20 (S.D.N.Y 1994); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49 (S.D.N.Y. 1989). In addition, as defendants point out, and plaintiff fails to respond, the privilege was effectively waived in light of Fabick's suing FABCO under the adverse litigation exception to joint

---

[1] There is one possible caveat: in reviewing the documents filed for *in camera* review, it appears that Foley's representation of Fabick may have shifted from joint to sole at some point. Initially, FABCO employees were either the direct recipient of letters from Foley & Lardner attorneys or copied on those letters; whereas, as the representation progressed, the letters started to be addressed to a Fabick employee. Perhaps at some point, the representation was solely of Fabick and not a joint representation with FABCO, but plaintiff has not developed this argument sufficiently, nor is it of any use with respect to the remaining privileged documents, which take place during a period when Foley was still representing both companies. Moreover, such an argument is a double-edge sword for Fabick because it would undercut plaintiff's position that FABCO was involved in the trademark application process and knew of their issuance. Finally, it is not apparent at what point one should or could draw a line between a joint representation and sole representation of Fabick.

representation privilege. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366 (3d Cir. 2007), *as amended* (Oct. 12, 2007).

Accordingly, the court will grant defendants' motion to compel in part, and will order plaintiff to produce promptly to defendants the documents identified by the court in its prior order as the "first category."

## SUMMARY JUDGMENT OPINION

## UNDISPUTED FACTS[2]

### A. Overview of the Parties

Plaintiff Fabick, Inc., is a Wisconsin corporation, with its principal place of business in Madison, Wisconsin. Fabick is in the business of developing, selling and applying protective coatings and sealants for various construction, commercial, industrial, mining, agricultural, equipment, containment, maritime, military and automotive uses.

Defendant FABCO Equipment, Inc., was a Wisconsin corporation, with its principal place of business in Milwaukee, Wisconsin. On July 1, 2015, co-defendant JFTCO, Inc., purchased substantially all of the assets of FABCO. Also on that date, FABCO changed its name to FEI Legacy, Inc., and that entity was dissolved on June 29, 2016.[3] Before July 1,

---

[2] Unless otherwise noted, the court finds the following facts undisputed for purposes of deciding the parties' cross motions for summary judgment. Because the parties provided a slew of proposed findings, the court will simply provide the essential background facts in this section and address other facts where relevant in the discussion below, rather than attempt to set forth all proposed, relevant facts at the beginning of this opinion.

[3] Given this, a question remains as to whether FABCO is even a proper party to this lawsuit, much less separately represented, but that is a question that will be deferred until the Final Pretrial Conference.

2015, FABCO operated as the exclusive Caterpillar dealer for Wisconsin and certain counties comprising the Upper Peninsula ("UP" of Michigan). In that capacity, FABCO was engaged in the business of selling, renting, servicing and repairing Caterpillar branded heavy equipment for use in a variety of industries including construction, agriculture, demolition and mining.

JFTCO, Inc., was organized as a Delaware corporation on March 13, 2015, and it is registered as a foreign corporation in the state of Wisconsin, effective June 5, 2015. JFTCO is a wholly-owned subsidiary of the John Fabick Tractor Company, which is a Caterpillar dealership headquartered in Fenton, Missouri. On July 1, 2015, JFTCO began operating in Wisconsin and Northern Michigan as the exclusive Caterpillar dealership under the name "Fabick CAT." JFTCO's primary business is the same as that previously engaged in by FABCO. Indeed, its assigned Caterpillar dealership territory is identical. Until July 1, 2015, the John Fabick Tractor Company was the Caterpillar dealer for an area encompassing parts of Missouri and Illinois, one county in Oklahoma and one county in Kansas.

### B. History of FABCO

The history of FABCO begins with a falling out between siblings in the previous generation of Fabicks, particularly John Fabick's sons Joseph Fabick, Sr. ("Joe")[4] and his brothers. In 1982, the John Fabick Tractor Company acquired two pre-existing Caterpillar

---

[4] Given the common last name "Fabick" of several of the related individuals involved in this lawsuit, the court will refer to individuals by their first names for ease of reference.

dealerships serving Wisconsin and the Upper Peninsula of Michigan with the intent that Joe could ultimately own a separate newly-formed Caterpillar dealership. Prior to acquiring these dealerships, Joe had worked with his brothers for the John Fabick Tractor Company, which ran a highly successful Caterpillar dealership serving its designated territory. So, in 1982, Joe moved to Wisconsin, founded FABCO, and served as President and CEO of FABCO from 1982 until 2001 over its own highly successful dealership. Joe then turned over FABCO to his son Jeré Fabick ("Jeré") and assumed the title of Chairman of FABCO, until his retirement in 2002.

FABCO continued to operate the Caterpillar dealership at multiple retail locations in Wisconsin and the UP of Michigan until it was sold on June 30, 2015. Within its territory, FABCO had three different types of location: (1) FABCO Equipment, primarily dealing with Caterpillar equipment and machines; (2) FABCO Power Systems, primarily dealing with Caterpillar engines and generators; and (3) FABCO Rents, which provided contractors with daily, weekly, monthly or longer-term rentals of equipment, usually the "smaller end of the Caterpillar line of equipment." FABCO Equipment and FABCO Power Systems may have been combined in one location, but FABCO Rents locations were independent, standalone facilities. FABCO sold new and used Caterpillar equipment, including Caterpillar trucks (at least for a few years) and attachments for Caterpillar equipment, such as snow wings. FABCO also serviced equipment, sold parts for Caterpillar machines and installed those parts as a function of its service component. FABCO customers' industries covered farming, mining, manufacturing, government entities and municipalities, construction and contractors.

Many of Joe's eight children were employed by FABCO at some point in time. Joseph Fabick, Jr. ("Jay") worked at FABCO from 1982 until December 31, 1997. Jay's brother Jeré worked for FABCO from 1982 until its sale to JFTCO on June 30, 2015. Jeré became the regional manager of FABCO's Madison and La Crosse branches in 1992 and held that position for about three years. From 1995 until 2001, Jeré was the Executive Vice President of FABCO. In 2001, he became its President and CEO. Beginning in June 2002, Jeré and his father Joe became the sole shareholders of FABCO; before that time, the shareholders included Joe, his eight children (including Jay and Jeré) and seventeen grandchildren.

In 2004, Jeré became the sole shareholder of FABCO. Jeré remained the President, CEO and sole shareholder of FABCO until FABCO ceased its operations and sold its assets to JFTCO. Currently, Jeré is the President of the John Fabick Tractor Company and its wholly owned subsidiaries, including JFTCO. He is also the Co-Dealer Principal of both the John Fabick Tractor Company and JFTCO. Doug Fabick is the current CEO and the other Co-Dealer Principal of the John Fabick Tractor Company.

For over a decade, FABCO primarily used the following mark in commerce:



(Defs.' Add'l PFOFs (dkt. #153) ¶ 103 (citing Jeré Fabick Decl. (dkt. #123) ¶ 18).)

## C. History of Fabick, Inc.

Around the time that Jeré became the heir apparent of FABCO, Fabick was formed and began operating as a division of FABCO, originally identified as FABCO Surface Protection for about a year before it was incorporated in December 1993. Fabick's business focused primarily on spray-on bedliners for pickup trucks and similar vehicles, though its products provide protection and coating in a variety of applications for an assortment of products, including products owned and operated by defendants' customers. At the time it was incorporated, FABCO owned 100% of Fabick's stock, and Joe was the majority shareholder of FABCO. At some point, Joe acquired 25% of the Fabick stock.

Jay was instrumental in the startup and operation of Fabick, and he was centrally involved in the business from its inception, including taking a leave of absence from his FABCO duties in 1995 to concentrate his efforts on building Fabick. During this time, Jay remained employed by FABCO as the Vice President of Product Support. Plaintiff also contends that Joe was also involved in Fabick's startup, and according to Jay, Joe was "probably the biggest supporter and promoter of Fabick, Inc." (Pl.'s Reply to PFOFs (dkt. #175) ¶ 56.)

Tom Svetnicka, currently the Vice President of Marketing for JFTCO, held positions in marketing and advertising with FABCO dating back to 1987. Svetnicka was also involved in Fabick's startup, though the parties dispute the extent of his involvement. At a minimum, Svetnicka attended at least one business meeting with a business consultant regarding Fabick's startup, created a list of potential names for Fabick, though "Fabick"

was *not* on that list, was involved in creating and designing the original logo for Fabick, including the color scheme, and assisted in creating an advertisement for Fabick.[5]

While owned by FABCO, Fabick had access to and used FABCO's customer lists, marketing personnel and product service representatives ("PSRs") to build its business. Fabick created a sales manual and a sales kit for use by PSRs, which described Fabick's products and services. Joe also sent a letter to PSRs, describing Fabick's business.[6] Fabick similarly participated in FABCO customer meetings and seminars and FABCO trade shows, with Fabick displaying its own products and brochures. Fabick further sent direct mail pieces to FABCO's customer list, which promoted its products and services. Finally, Fabick advertised in the same media as FABCO, including Western Builder publication and Terra Construction and Engineering Corporation's publication.

On December 30, 1997, Jay's employment was formally terminated by FABCO. FABCO negotiated with Jay and ultimately offered him a severance package that included taking over Fabick, Inc., as its sole owner. On December 31, 1997, FABCO and Joe transferred 100% of the corporation's stock in Fabick to Jay. Since acquiring the stock, Jay has been the President and sole shareholder of Fabick. After Fabick and Jay separated

---

[5] Even so, Svetnicka minimizes his involvement, averring that his involvement with Fabick "was a very minor portion of his responsibilities at the time, likely accounting for less 0-5% of his time in any given week." (Defs.' Add'l PFOFs (dkt. #152) ¶ 138 (citing Svetnicka Decl. (dkt. #168) ¶ 5).)

[6] The parties dispute whether the letter is admissible. Because it appears to be offered mainly to show Joe's involvement in Fabick's business, rather than the truth of the matter asserted, and may fall within the hearsay exception under Federal Rule of Evidence 803(16), the court will consider it for purposes of summary judgment. Obviously, defendants may renew their objection in their pretrial submissions.

from FABCO, Fabick and FABCO operated entirely independently without incident for a number of years.

### D. Fabick's Trademarks, Service Marks and Domain Names

On March 25, 1994, while still a wholly-owned subsidiary of FABCO, Fabick filed a trademark application with the United States Patent and Trademark Office for the mark "FABICK" for a "polyurethane-based and polyureabased sealers and protectants to be applied as a coating to hard or flexible surfaces." On April 11, 1994, Fabick also filed a service mark application with the USPTO for the mark "FABICK." On August 22, 1995, Fabick's service mark application was granted, with a date of first use of October 5, 1995, identified. On December 4, 1995, Fabick registered the domain name www.fabick.com. Finally, on January 14, 1997, while FABCO still owned 75% of Fabick's stock, its trademark application was granted. (*See* Dettmann Decl., Exs. TT, UU (dkt. ##113-10, 113-11).)

In his capacity as President and based on 20 years' experience with Fabick, as well as with the coatings and sealants industry, Jay represents that the FABICK marks have become well known in the coatings and sealants industry. (Pl.'s PFOFs (dkt. #93) ¶ 85 (citing Jay Fabick Decl. (dkt. #105) ¶ 28).) Fabick's basic logo, depicted below, has remained unchanged since Fabick filed its trademark and service mark applications (including this logo in both):



(Pls.' Reply to PFOFs (dkt. #175) ¶ 85.a (citing Dettmann Decl., Exs. RR, SS (dkt. ##113-8, 113-9).)  Defendants direct the court to two other logos to argue that Fabick has used a number of different logos, though these two share the same basic attributes as the one above:

 

(Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 85.a (citing Schroeder Decl., Ex. P (dkt. #125-16); Schroeder Decl., Ex. WW (dkt. #165-2).)

DISCUSSION

Plaintiff asserts claims against both JFTCO and FABCO for trademark infringement and false advertising under the Lanham Act, 15 U.S.C. § 1114(1) and § 1125 (claims 1 and 2) and for trademark infringement under state common law (claim 3).  (2d Am. Compl.

(dkt. #143).)  The parties' cross motions for summary judgment raise a variety of arguments, including several that apply to all three claims, which the court attempts to address in an orderly fashion in this opinion.

## I.  FABCO's Liability

As an initial matter, defendants seek summary judgment as to all claims asserted against defendant FABCO because it did not use the name FABICK in commerce.[7]  To demonstrate direct infringement, plaintiff's federal statutory claims *and* the state common law claim require "use in commerce" to be liable.  *See* 15 U.S.C. § 1114(1) (requiring proof of defendant's "*use in commerce* and reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . " (emphasis added)); 15 U.S.C. § 1125(a)(1)(A) (providing a claim for false advertising against "any person who . . . *uses in commerce* . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - (A) is likely to cause confusion . . ." (emphasis added)); *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989) (explaining that Wisconsin common law claim for trademark infringement requires the same core elements as under federal law).

---

[7] Again, as a defunct entity, Fabick's reason for maintaining any claim against FABCO at this point is curious, unless out of some abundant caution as to completeness or insurance coverage, but the parties have not raised the issue on summary judgment, so neither will the court.

To understand this basis for summary judgment, the parties provide additional details about the acquisition of FABCO, creation of JFTCO and use of the Fabick CAT name. In 2014, Jeré began considering a succession plan for FABCO. Specifically, in an effort to keep FABCO in the Fabick family, Jeré considered approaching his cousin, Doug Fabick, the CEO of the John Fabick Tractor Company, which originally formed FABCO in 1982, about a possible acquisition or merger. Before approaching the John Fabick Tractor Company regarding a possible merger or acquisition, however, Jeré first approached Caterpillar to get its approval. During the fall of 2014, FABCO and the John Fabick Tractor Company then engaged in discussions with Caterpillar to obtain final approval of the proposed acquisition.

A December 9, 2014, letter from Jeré and Doug to Caterpillar, states that "[t]he intent is to begin changing the 'FABCO' brand to 'FABCO - a Fabick family company' immediately and eventually moving to the Fabick brand." (Pl.'s PFOFs (dkt. #93) ¶ 152 (citing Dettmann, Decl., Ex. K (dkt. #109-7)).) Jeré testified at his deposition that this brand name change was "intended to provide a smooth transition. You know, they know the Fabick family name, but probably to get the Fabick family name out a little bit more prominently in advance of -- as part of the transition process." (Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 153 (quoting Jeré Fabick Dep. (dkt. #126) 108).)

By December of 2014, the decision was made to rebrand FABCO as "Fabick CAT." JFTCO was then formed in 2015 in anticipation of the purchase of FABCO's assets for the purposes of operating the Caterpillar dealerships located in Wisconsin and Northern Michigan. Caterpillar approved the merger on January 27, 2015.

In February, the merger, including the planned rebranding to Fabick CAT, was communicated to employees, customers and partners of both companies. The latter announcement stated that: FABCO and the John Fabick Tractor Company "have reached an agreement to join FABCO and Fabick CAT into one Caterpillar dealership"; "[o]ver the next several months, FABCO/Fabick teams will be working together to complete this transformation with an expected closing date of June 30, 2015"; the "the FABCO identity will transition over time to the Fabick Cat identity; [and] this change is expected to take place over the next 36 months." (Pl.'s PFOFs (dkt. #93) ¶ 163 (quoting Dettmann Decl., Ex. O (dkt. #109-11).)

A February 2015 press release also used the "Fabick CAT" name and logo. (*Id.* at ¶ 166 (citing Dettmann Decl., Ex. M (dkt. #109-9).) FABCO issued similar notices and advertisements between February and June 30, 2015, which referenced bringing "Fabick family dealerships back together" and used the phrase "A Fabick Family Company." (*Id.* at ¶¶ 167-75.) Defendants do not dispute any of this, although they point out that any reference to "Fabick" by FABCO was only "in a limited number of advertisements that were placed over a very brief period of time." (*See, e.g.*, Defs.' Resp. to Pl.'s PFOFs (dkt. #175) ¶ 173.) Plaintiff also points out that Tom Svetnicka, the current Vice President of Marketing for JFTCO who held prior positions in marketing and advertising with FABCO dating back to 1987, created various iterations of the Fabick CAT logo.[8]

---

[8] Before creating the new FABICK CAT logo, Svetnicka further acknowledges that he did not conduct any trademark searches, or otherwise conduct searches for companies using the "Fabick" name in Wisconsin or the UP of Michigan.

While defendants originally intended to phase out FABCO and transition to Fabick CAT over a 36-month period, the John Fabick Tractor Company and JFTCO decided to accelerate the rebranding. Accordingly, as of July 1, 2015, the date JFTCO began operating the Wisconsin and Northern Michigan Caterpillar dealership, FABCO logos were replaced with Fabick logos. JFTCO spent over $250,000 on new signage in 2015, and approximately $45,000 more in 2016. FABCO's websites are no longer operational. On certain signs in Madison, Wisconsin and Marquette, Michigan, the FABCO signs were replaced with signs containing only the word "Fabick," without any reference to "CAT," although after plaintiff's filing of this complaint, which referenced the "Fabick" sign on the Madison building facing the Beltline, JFTCO removed these signs.

On this record, defendants maintain that neither FABCO nor FEI Legacy used the Fabick CAT mark in commerce. Instead, the first use of the Fabick CAT mark in commerce occurred after the APA was consummated on July 1, 2015, and thus after FABCO ceased all operations. Defendants argue, therefore, that FABCO's responsibility is limited to using the Fabick name in announcements of the merger, which courts have generally found forms an insufficient basis to qualify as "use in commerce." *See Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 762-63 (8th Cir. 2010) (affirming grant of summary judgment to defendant, finding "two customer presentations, a press release, an announcement, and a website" without any sale or transport of goods containing the mark insufficient to demonstrate "use in commerce"); *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1359-60 (Fed. Cir. 2009) ("[M]ere preparations to use that mark sometime in the future will not do.").

In response, plaintiff argues that FABCO is liable for *contributory* infringement because "FABCO was directly involved in the joint decision to begin using the infringing Fabick CAT tradename," including issuing a press release, accelerating the transition to that name, and using one of its employees to create the Fabick CAT logo. (Pl.'s Opp'n (dkt. #147) 4.)[9] To establish contributory infringement, however, a plaintiff must show intent on the part of the defendant and knowledge of the wrongful activities of the direct infringer. *See David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir. 1989). Contributory infringement typically occurs in the context of a manufacturer - distributor relationship:

> A manufacturer can be held liable for contributory trademark infringement even if it does not itself mislabel the goods or deceive any customers. If a distributor "[i]ntentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement the ... distributor is contributorily responsible...."

*Id.* (quoting *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 853-54 (1982)). Still, as plaintiff points out, the Seventh Circuit in *Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143 (7th Cir. 1993), "treated trademark infringement as a species of tort" and "have turned to common law to guide our inquiry into the appropriate boundaries of liability," including expanding the doctrine to cover landlords and licensees, for example. *Id.* at 1148-49.

---

[9] Plaintiff hints that FABCO may be liable for direct infringement by use of "A Fabick Family Company" in three advertisement between the announcement of the merger and the July 1, 2015, transition. However, this is contrary to plaintiff's main theory that the confusion began after July 1, 2015, with the rebranding to Fabick CAT. Thus, there is insufficient evidence of confusion based on the use of this advertisement alone.

Here, plaintiff contends that FABCO knew of its FABICK trademarks and, at a minimum, facilitated JFTCO's adoption of a trademark that infringes plaintiff's. Notwithstanding defendants' denials, moreover, there are factual disputes as to the extent of FABCO's knowledge, as described in the section of the opinion below dealing with defendant's unclean hands defense. (*See infra* Opinion § IV.) In particular, there appears to be no dispute that FABCO was involved in arranging and paying for Fabick's legal representation in 1994 and 1995 to pursue the trademark applications, nor that Tom Svetnicka (a FABCO employee at the time and a current JFTCO employee) was involved in designing the Fabick mark. As such, plaintiff has raised a genuine issue of material fact as to whether FABCO had actual knowledge of the Fabick trademarks.

Alternatively, defendants argue that the decision to use the Fabick name was made by the John Fabick Tractor Company, consistent with its own, long-standing use of the Fabick name, and not by FABCO. But here, too, the record permits a contrary inference, including FABCO's involvement in the discussions with the John Fabick Tractor Company and Caterpillar on post-acquisition, re-branding plans. Moreover, Svetnicka contributed to the design of the Fabick CAT lock up, even if the contribution were limited to italicizing the Fabick name to resemble the FABCO mark.

On this record, therefore, a reasonable jury could find that FABCO was involved in the decision to adopt the Fabick name, sufficient to hold it liable under a contributory infringement theory, although not that FABCO used the mark in commerce itself. As such, the court will grant judgment to FABCO on any direct infringement claim, but will deny it as to a claim for contributory infringement.

## II. Prior Use of "Fabick" Name

Defendants separately seek summary judgment on plaintiff's claims on the basis that the John Fabick Tractor Company's extensive use of the Fabick name precludes plaintiff's claims. "The party who first appropriates a mark through use, and for whom the mark serves as a designation of source, acquires superior right to it." *Johnny Blastoff v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999). This is true even where a party, like plaintiff, later registers the mark. *See* 15 U.S.C. § 1065 (creating an exception to right of trademark owner where "the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration"); *see also Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 357 F.3d 649, 651 (7th Cir. 2003) ("Section 1065 says that even 'incontestable' marks must yield to prior users.").

Indeed, the Lanham specifically provides for an affirmative defense based on prior use. In particular, 15 U.S.C. § 1115(b) sets forth certain defenses to incontestability, including:

> (5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, that this defense or defect shall apply only for the area in which such continuous prior use is proved;

In support of this basis for summary judgment, defendants describe the John Fabick Tractor Company's use of the "Fabick" mark generally, and specifically its use in Wisconsin and Northern Michigan.[10] By way of further context, it is undisputed that John Fabick, Sr., the grandfather and patriarch of all the Fabicks warring in this litigation, began selling tractors in St. Louis, Missouri, in 1917. A decade later, the John Fabick Tractor Company was incorporated by John Fabick, Sr., and it was awarded an exclusive territory to sell Caterpillar tractors in St. Louis, Missouri, in 1927. Since its founding, that company has been led by Fabicks, first by John Fabick, Sr., then his sons John Fabick II and Francis Fabick, grandsons Harry Fabick and Jeré Fabick, and then great grandson Doug Fabick (Harry's son). Joe, the founder of FABCO and Jay and Jeré's father, was the youngest son of John Fabick, Sr. As previously explained, Joe was also an executive for the John Fabick Tractor Company before acquiring his own Caterpillar dealership and forming FABCO, and would have been well aware of the extensive use of "Fabick" by that company as well at the time he was pursuing the trademark for FABCO and Fabick.

The John Fabick Tractor Company and its subsidiaries, including JFTCO, are engaged in the selling and servicing of Caterpillar branded heavy equipment. Defendants contend that "[c]ollectively, the John Fabick Tractor Company and its subsidiaries have

---

[10] Defendants also put forth some evidence that FABCO itself used the "Fabick" name. (*See* Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 37 (citing Svetnicka Decl. (dkt. #168) ¶¶ 13-17; *id.*, Exs. A, B and C (dkt. ##168-1 to 168-3) (FABCO brochures and other marketing materials referencing FABCO's combined heritage with the John Fabick Tractor Company).) This evidence, however, is minimal, and it is also contradicted by other evidence, particularly the testimony of Jeré Fabick that FABCO only used the name "FABCO" to market and advertise its services to the public, and only used the name "Fabick" when FABCO initially formed plaintiff Fabick, Inc. (Pl.'s Reply to PFOFs (dkt. #175) ¶¶ 37-38.)

historically been referred to as 'the Fabick Companies.'" (Defs.' Add'l PFOFs (dkt. #153) ¶ 16.)[11] Part of the support for this finding includes Jay Fabick's application for employment in 1976, titled "The Fabick Company Application for Employment," along with various brochures and other product materials, dating back to the 1940s, using the "Fabick" surname as a mark, like the following:

 



---

[11] Plaintiff challenges this finding on the basis that defendants do not identify which subsidiaries, the timing of such a designation or the geographic areas of those subsidiaries. (Pl.'s Resp. to Defs.' PFOFs (dkt. #173) ¶ 16.)

24



(Defs.' Add'l PFOFs (dkt. #153) ¶¶ 17-18, 21-22.)  In connection with the John Fabick Tractor Company's 75th anniversary in 1992, the Missouri History Museum created an archive collection on the company, which included promotional materials and other publications using the "Fabick" name.  (Defs.' PFOFs (dkt. #120) ¶¶ 54-58.)[12]

The John Fabick Tractor Company and its subsidiaries also offers evidence of its prior use of websites that incorporated the Fabick family name as part of the domain name, specifically www.johnfabick.com, registered on May 7, 1996, and www.fabickcat.com, registered on February 17, 2004.

In accordance with Caterpillar Inc.'s dealer guidelines, both the John Fabick Tractor Company and its wholly owned subsidiaries have presented themselves to the public under

---

[12] Plaintiff is free to renew its authenticity objection to the documents purportedly included in the Missouri History Museum, but the court finds that Federal Rule of Evidence 901(b)(8) for authenticating ancient documents applies for purposes of summary judgment.  Further, the court questions whether plaintiff is really insisting on in-person authentication at trial, and will consider any reasonable accommodation for live video testimony of an archivist or person(s) able to swear to contemporaneous use of these materials.  As for plaintiff's hearsay objection, the court does not understand it, both because it is not being offered for "its truth" and because Rule 803(16) provides an exception to the hearsay rule for documents over 20 years old, but again plaintiff may revisit this ruling in advance of trial.  (*See* Defs.' Reply to PFOFs (dkt. #184) ¶ 54.)

the FABICK CAT name since at least 2002. FABCO identified itself as FABCO CAT, and, after the acquisition of FABCO's assets, the John Fabick Tractor Company modified its dealer logo to incorporate aspects of the previous FABCO look (namely the italicized font), all three of which are shown below:



(former FABICK CAT dealer lockup)



(former FABCO CAT dealer lockup)



(redesigned FABICK CAT dealer lockup)

(Defs.' Add'l PFOFs (dkt. #153) ¶ 181 (citing Svetnicka Decl. (dkt. #168) ¶ 20).) Caterpillar regulates the color and dimensions, with the only variable being the words in the yellow box.

Defendants also contend that the prior use of the "Fabick" name in the sale or rental of pipeline equipment and related services provides a basis for finding defendants' use superior to that of plaintiff. Historically, the John Fabick Tractor Company was one of several Caterpillar dealerships with expertise in supplying heavy equipment and machinery to the pipeline industry. Caterpillar did not impose territorial restrictions in the United

States on such sales, rentals and related services.[13]  By the early 1990s, the John Fabick

Tractor Company had developed a substantial customer base for its pipeline business, as

evidenced by a May 1994 directory of contacts, listing over 30 contractor customers in

Wisconsin and Michigan.  (Defs.' Add'l PFOFs (dkt. #153) ¶ 39 (citing Grothe Decl. (dkt.

#132) ¶ 10; *id.*, Ex. A (dkt. #132-1)).)   Gerry Grothe, one of the pipeline sales

representatives through the late 1980s, 1990s and early 2000s, avers that he personally

promoted John Fabick Tractor company products and services to the pipeline industry

using the Fabick name and associated logos, including on invoices, rental agreements,

purchase orders and brochures, and he routinely called on contractors located in Wisconsin

and Michigan.  (*Id.* at ¶¶ 42-51.)  Furthermore, sales data from the 1970s to 2002 show

pipeline related sales in Wisconsin reaching in excess of half a million dollars in some

years.[14]

Defendants further point to John Fabick Tractor Company's extensive history

selling used equipment, which similarly involves no territorial restrictions.   Here, too,

defendants point to evidence that the Fabick name was used to promote used Caterpillar

equipment in Wisconsin and Michigan.   By at least the 1970s and continuing to the

---

[13] In 2005, the John Fabick Tractor Company's pipeline business was spun off into PipeLine Machinery International ("PLM"), but PLM still relies predominantly on the John Fabick Tractor Company to provide parts and services to support to its pipeline customers.

[14] Plaintiff objects to this sales data on the basis that defendants failed to lay a proper foundation under Federal Rule of Evidence 1006.  (Pl.'s Resp. to Defs.' Add'l PFOFs (dkt. #173) ¶ 55.)  The declaration of Steve Overkamp sets forth the foundation for the documents underlying the 1006 summary of sales data.  (Overkamp Decl. (dkt. #124) (describing his use of pre-2002 software to generate reports of historical sales and the creation of a table summarizing those sales).)  To the extent defendants have not made the underlying documents available to plaintiff in a manner that allows confirmation of the summary's accuracy, it should do so promptly or risk exclusion at trial.

present time, the John Fabick Tractor Company was advertising its used equipment inventory throughout the Midwest, including in Wisconsin and Michigan. Specifically, the John Fabick Tractor Company has routinely advertised its used equipment in the Construction Equipment Guide since at least the 1990s. (*See, e.g.*, Defs.' Add'l PFOFs (dkt. #153) ¶ 66 (citing Borlinghaus Decl., Ex. B (dkt. #134-2) 3); *see also id.* at ¶ 67.) The Midwest Edition of the Construction Equipment Guide claims to have a circulation of 24,805 and a distribution territory including Wisconsin and Michigan.[15]

Based on this evidence, defendants contend that the "John Fabick Tractor Company's use of the FABICK name nationally, including in Wisconsin and Michigan, has been continuous from before Plaintiff was formed in 1993 through the present day." (Defs.' PFOFs (dkt. #120) ¶ 96.) In response to this fairly compelling evidence, plaintiff offers two core arguments: (1) JFTCO cannot rely on the John Fabick Tractor Company's prior use; and (2) even if JFTCO could rely on such use, it would have to demonstrate that the previously-used mark of the JOHN FABICK TRACTOR COMPANY is the legal equivalent of the current FABICK CAT mark.

As to the *first* argument, plaintiff contends that "[w]hile use of a mark by a subsidiary may inure to the benefit of the parent entity, the converse is not true." (Pl.'s Opp'n (dkt. #147) 10.) In support, plaintiff principally relies on an opinion by the Trademark Trial and Appeal Board, *Noble House Home Furnishings, LLC*, 2016 WL 3357265, 118 U.S.P.Q.2d 1413 (T.T.A.B. Apr. 4, 2016). In *Noble House*, the TTAB

---

[15] In their reply in support of their own proposed findings of facts, defendants produced additional samples of advertisements, dating back to the 1940s, which prominently displayed the "Fabick" name throughout the United States. (*See* Defs.' Reply to PFOFs 9dkt. #184) ¶ 89.)

considered "whether use of the mark by Respondent's parent corporation inures to the benefit of Respondent" (*id.* at *1), but the court's inquiry was in the context of a motion to cancel the trademark based on abandonment under 15 U.S.C. § 1127. After a trial, TTAB determined that the subsidiary company, who was the registrant of the mark, was not using the mark in any way; instead, the parent corporation was the sole user. *Id.* at *6-9. As such, the opinion turned on whether the parent company qualified as a "related company" under 15 U.S.C. § 1055. *Id.* at *10. Because there was no license agreement between the parent and subsidiary or other indication of control by the subsidiary holding the registration, TTAB concluded that the parent company's use did not inure to the benefit of the registrant, and, therefore, the registrant had abandoned the mark. *Id.* at *11.

The facts, and more critically, the legal theory, at issue in *Noble House* simply does not fit the assertion of prior use at issue here. *Noble House* concerns the obligations of trademark registrants to use their marks in commerce. Here, JFTCO is not relying on the John Fabick Truck Company's use of the "Fabick" mark for purposes of defending against a claim of abandonment or some other theory based on JFTCO's continued use; rather, JFTCO points to its parent company's use of the mark to establish superior rights. As TTAB recognized itself, the holding and reasoning in that case is simply inapplicable to the issue here. *See Noble House*, 2016 WL 3357265, at *9 ("[T]he issue to be decided is not whether Respondent or its parent is entitled to use the NOBLE HOUSE mark for furniture in the United States."). Instead, as defendants argue in response, the appropriate test for determining whether JFTCO may rely on the John Fabick Tractor Company's superior rights is whether the John Fabick Tractor Company and JFTCO specifically, or its

subsidiaries more broadly, "were operated in such a[] way that they appeared to the consuming public as one entity." *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 340 (Fed. Cir. 1997) (citing *W. Fla. Seafood, Inc. v. Jet Restaurants, Inc.*, 31 F.3d 1122, 1126 (Fed. Cir. 1994), for the proposition "recognizing that separate corporate, business and personal entities that operate as a single entity in the eyes of the consuming public may be treated as such for trademark purposes").

Defendants contend that the John Fabick Tractor Company and its subsidiaries are presented just so, directing the court to the shared "Fabick" name in each of its wholly-owned subsidiaries: Fabick Machinery Company, Fabick & Company, Fabick Brothers Equipment Co., Fabick Southwest Co., Fabick Tractor Company of Tennessee, Fabick Power Systems, Inc., and JFTCO. (Note that JFTCO is simply the acronym of the John Fabick Tractor Company.) (Defs.' Add'l PFOFs (dkt. #153) ¶ 72.) These entities share the same websites, and the John Fabick Tractor Company and JFTCO share the same Board of Directors and officers. In the face of this evidence, plaintiff simply points to the fact that on its invoices, JFTCO requires payment to JFTCO. That fact alone is obviously insufficient to find as a matter of undisputed fact that the John Fabick Tractor Company operated its business and subsidiaries in such a way that the consuming public did not view the entities as one.

*Second*, plaintiff argues that to rely on a prior use defense, defendants would also have to prove that the prior use of the JOHN FABICK TRACTOR COMPANY mark is the legal equivalent of the FABICK CAT mark, under a so-called "tacking" theory. (Pl.'s Opp'n (dkt. #147) 24 (citing *Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 910 (2015)

(explaining that the "general rule" is that two marks may be "tacked" when the original and revised marks are 'legal equivalents'" and holding that the issue of tacking is generally a question of fact for a jury).  For purposes of proving tacking, defendants must demonstrate that the two marks "create the same, continuing commercial impression so that consumers consider both as the same mark."  *Hana Fin.*, 135 S. Ct. at 910 (quotation marks and internal citation omitted).

Plaintiff's argument, however, is again grounded on a false premise:  defendants are *not* arguing that the use of the JOHN FABICK TRACTOR COMPANY mark constitutes prior use, entitling them to use of the "Fabick" name; instead, as visually demonstrated above, defendants focus on the prior use of the FABICK mark.  Still, factual disputes remain as to whether the consuming public would view the prior use of the FABICK mark as the same as the current use of JTFCO's Fabick CAT mark, as juxtaposed below:

   

In sum, questions remain as to:  (1) whether the John Fabick Tractor Company's use of the "Fabick" mark either in Wisconsin or to establish a national brand was sufficient to constitute prior use; (2) whether JFTCO and the John Fabick Tractor Company are viewed by the consuming public as one entity for purposes of JFTCO relying on the John Fabick Tractor Company's prior use; and (3) whether the current Fabick CAT mark is the legal equivalent of the prior Fabick mark used by the John Fabick Tractor Company.  For

these reasons, the court will deny defendants' motion for summary judgment based on a prior use defense.[16]

## III. Likelihood of Confusion

The parties also filed cross motions seeking judgment in their respective favor depending upon whether a reasonable jury could find or would be compelled to find a likelihood of confusion. As is often the case when two sides look at the same set of facts and reach nearly polar opposite conclusions (as opposed to a dispute of law), this is usually a question for the trier of fact. In order to prevail on its Lanham Act claims, plaintiff must show that (1) its mark is protectable and (2) defendants' use of the mark is likely to cause confusion among consumers. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001).[17] For purposes of summary judgment, the parties focus their attention on the second prong -- likelihood of confusion.[18]

Courts generally consider seven factors in determining the likelihood of confusion:

> (1) the similarity of the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by

---

[16] Of course, the court's ruling on summary judgment does not preclude the possibility of a directed verdict on this defense because, as previously acknowledged, this remains a close question given the abundant evidence of prior use of the FABICK mark alone and in conjunction with other marks, though it certainly makes a directed verdict less likely.

[17] The common law trademark infringement claim similarly looks to "the validity of the mark and the likelihood of confusion." *See Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989) (reviewing Wisconsin common law trademark infringement claim).

[18] As for whether plaintiff's trademark is protectable, the Lanham Act provides that registration of a mark "shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark in commerce[.]" 15 U.S.C. § 1115(a). Defendants' challenge to whether plaintiff's trademark is protectable appears tied to its prior use defense already addressed above.

> consumers; (5) the strength of the plaintiff's mark; (6) whether
> any actual confusion exists; and (7) the defendant's intent to
> palm off its goods as those of the plaintiffs.

*Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (internal citation omitted).

No single factor is dispositive, and the court may assign varying weights to each factor

based on the particular case. *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044

(7th Cir. 2000) (internal quotation marks omitted). The Seventh Circuit has, however,

recognized that three of the factors are particularly important: the similarity of the marks,

the defendant's intent and actual confusion. *Id.* (citing *Eli Lilly & Co. v. Nat. Answers, Inc.*,

233 F.3d 456, 461 (7th Cir. 2000)). While the court analyzes each of the factors below,

when viewed as a whole, defendants have raised a genuine issue of material fact as to

whether JFTCO's use of the mark is likely to cause confusion among consumers, thus

warranting denial of both parties' motions.

### A. Similarity of the Marks

A court may examine marks for "similarity of 'sound, sight and meaning.'" *Henri's*

*Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983) (quoting *Plough, Inc.*

*v. Kreis Labs.*, 314 F.2d 635, 638 (9th Cir. 1963)). "Different packaging, coloring, and

labeling can be significant factors in determining whether there is a likelihood of

confusion." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 644 (7th Cir. 2001). If one word

or feature of a composite trademark is the salient portion of the mark, it may be given more

weight than the surrounding elements. *Int'l Kennel Club,* 846 F.2d at 1087-88 (quoting

*Henri's Food Prods.*, 717 F.2d at 356). Nevertheless, an inquiry into similarity will look at

the entirety of the marks, not just one specific component. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008).

The Seventh Circuit cautions that "when the public does not encounter the two marks together, it is inappropriate to focus on minor stylistic differences to determine if confusion is likely." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997). Instead, courts must "make their comparison 'in light of what happens in the marketplace,' not merely by looking at the two marks side-by-side." *Id.* (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976)).

Given the prominence of the word "Fabick" in both marks, this factor would appear to weigh heavily in plaintiff's favor, or at least a reasonable jury could so find. Still, defendants stress: (1) the prevalence of the additional words "Coatings & Sealants," "Truck Liners," and similar words in some of plaintiff's logo; and (2) the use of "CAT" and Caterpillar's distinctive yellow and black color scheme in defendants' logo. Defendants argue that both undercut a finding of similarity.[19]

In arguing their separate positions, the parties direct the court to a variety of cases considering similarities of marks, but it makes little sense to address them given the fact issues the jury must consider in weighing this factor -- specifically, whether FABICK is the

---

[19] Among the evidence defendants offer in support of this argument is the expert testimony of Dr. Neeraj Arora. (Defs.' Add'l PFOFs (dkt. #173) ¶¶ 328-339.) Buried in its opposition to defendants' motion for summary judgment, plaintiff seeks to strike Arora's testimony on the bases that it is not helpful to the trier of fact and not reliable. Because the court concludes that summary judgment is inappropriate on the basis of the similarly of the marks specifically or the likelihood of confusion element more generally, regardless of Arora's testimony, it need not address plaintiff's motion to strike it on summary judgment. Plaintiff, of course, is free to renew the request in a proper *Daubert* motion.

salient portion of both marks and whether CAT in the Fabick CAT mark is the salient portion are both factual questions for the jury. Similarly, while the court is inclined to take judicial notice that CAT is a famous mark, or at least that no reasonable jury could find otherwise on the evidence presented, the relevance of such a finding to distinguishing the Fabick CAT mark from FABICK remains a question for the jury, especially in light of plaintiff's primarily pursuing a reverse confusion claim. *See Sorenson v. WD-40 Co.*, 792 F.3d 712, 727-28 (7th Cir. 2015) (describing reverse confusion as likely claim where junior user has a famous mark). Finally, whether differences in font, color and style more generally undercut the importance of the shared name is also a question for the jury.

## B. Similarity of Products

As noted generally above, Fabick is in the business of selling coatings and sealants in a number of industries, including construction, industrial, agricultural, highway construction and road building, mining, automotive and original equipment manufacturing. Fabick offers a wide range of coatings, designed to be either sprayed or poured on, including some requiring application using specifically-designed equipment and methods. Fabick's sealants have been similarly developed to provide protection in a variety of applications and are most commonly used in the highway, parking, weather and traffic sensor markets. The coatings and sealants are used on projects ranging from industrial equipment, vehicles and machinery to rock or slope paving. For example, when used on the bed of a dump truck, the coating creates a bedliner that covers the entire area of the dump box, forming a smooth, seamless surface that promotes payload release, reduces material retention and protects from rust and abrasion

As also noted above, JFTCO does not sell, nor has it ever sold, *any* chemical coating or sealant products, nor any bed liner products. Like FABCO, JFTCO continues to sell new and used Caterpillar equipment, including, dozers, dump trucks, skid steer loaders, among other types of equipment. (*See* Pl.'s PFOFs (dkt. #93) ¶ 191.a.) Similarly, JFTCO sells new, used and remanufactured power systems parts for both Caterpillar and non-Caterpillar equipment, and it provides repair services for that equipment. Some of the industries that purchase JFTCO's products and services include agriculture, construction, forestry, landscaping, mining, oil and gas, paving and road building and waste. JFTCO also has a rental arm called "Fabick Rents - the Cat® Rental Store," which provides rental of Caterpillar machines. Plaintiff points out that the website also refers to itself simply as "Fabick Rents" without any reference to "CAT."

JFTCO's prices for purchasing a piece of equipment range from $20,000 to multiple millions of dollars. The vast majority of JFTCO's customers are either commercial entities or governmental bodies, and given the purchase prices, JFCTO customers often seek requests for proposals and review bids by JFTCO and its competitors before purchasing a piece of equipment. Parts and services are offered primarily with respect to Caterpillar equipment, often as a continuation of the dealer-purchaser relationship.

There is no dispute that the parties do not sell the same products. Trademark law, however, "prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be 'closely related' to the senior user's." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992). "A 'closely related' product is one 'which would reasonably

be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* (quoting 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 24:3, at 166).

Here, plaintiff puts forth some evidence of cross-selling opportunities between its products and those of JFTCO, namely liners for dump truck beds, applications on non-fuel and hydraulic tanks used on heavy equipment, and coatings on buckets and blades that JFTCO sells as attachments to various pieces of CAT equipment. Still, as defendants point out, a review of plaintiff's sales since 2010, reveal minimal, if any, sales applicable to JFTCO's line of business. Indeed, as defendants point out, plaintiff is now almost exclusively a chemical supplier, with its largest customer of chemical products being a furniture manufacturer that uses Fabick's product to coat its furniture. Plaintiff's highest selling product is its Pour-Pac product, which is used to protect traffic and weather sensors in the grooves of concrete and/or asphalt roadways. In contrast, plaintiff's bedliner products represents a very minor portion of plaintiff's current revenues. Even if there were confusion, it would likely inure to plaintiff's benefit, in that defendants' association with the mark is likely to strengthen consumer confidence in plaintiff's products, not weaken it.

From this review, the similarity of products factor would, therefore, appear to cut against a finding of likelihood of confusion, but the jury would need to assess how closely related Fabick's sealants and coatings are to the products lines sold and supported by JFTCO. Moreover, as explained above, even if the court were to find the factor undisputable, this factor is less significant than the similarity of marks, evidence of actual confusion and defendant's intent in adopting the alleged infringing mark.

## C. Area and Manner of Concurrent Use

For this factor, the court considers

> (1) the relative geographical distribution areas; (2) whether there exists evidence of direct competition between the products; (3) whether the products are sold to consumers in the same type of store; (4) whether the products are sold in the similar section of a particular store; and (5) whether the product is sold through the same marketing channels.

*Ty, Inc.*, 237 F.3d at 900 (internal citations omitted). Some of these sub-factors touch on the same issues described above in considering the similarity of the products.

Plaintiff alleges trademark infringement based on defendants' use of the Fabick name in Wisconsin. Fabick markets and sells its products and services nationally and internationally, but Fabick's sole location is in Wisconsin, with over half of its sales to customers in Wisconsin. JFTCO currently has 19 locations in Wisconsin and one in Northern Michigan.

While there is no direct competition between plaintiff's and defendants' products, nor are the products sold at the same location, Fabick contends that the products are sold through the same marketing channels, to overlapping customers. In particular, Fabick represents that its "coatings are routinely applied to the types of machinery and equipment sold by FABCO and JFTCO," including dump trucks, the fuel and hydraulic tanks of heavy machinery, the cabs and walk surfaces or wear times of heavy equipment and machinery to create an anti-skid surface, snowplow blades, buckets on front-end loaders and dozers. (Pl.'s PFOFs (dkt. #93) ¶ 103.) Moreover, since Fabick's coatings are customizable and sprayed or poured on to fit the specific application, Fabick's coatings could be applied to virtually any type of machinery or implement previously sold by FABCO and currently

38

sold by JFTCO. Fabick has a fully-equipped mobile coating system, which allows it to apply coatings virtually anywhere and on any kind of service. For retail purposes, Fabick has outside applicators throughout Wisconsin that apply Fabick's coatings. Fabick also provides equipment for those outside applicators to use to apply the coatings and sealants, along with promotional items to market and advertise Fabick's products and services, including window stickers and template brochures.

While defendants do not appear to dispute that these type of applications are available, they contend that the application of plaintiff's products to the types of machinery and equipment sold by FABCO and JFTCO is "unusual and not routine," directing the court to plaintiff's sales records from January 2010 to November 2016. (Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 103.) Apparently conceding the same with respect to its current business mix, plaintiff contends that it is "actively seeking to expand its market share in providing off-highway dump truck bed coatings, as well as in providing anti-skid surfaces on a variety of heavy equipment that contains walk surfaces and wear items." (Pl.'s PFOFs (dkt. #93) ¶ 104.) Plaintiff also contends that it shares a "number of common customers and vendors" with defendants. (Pl.'s PFOFs (dkt. #93) ¶ 139.) Specifically, Fabick and JFTCO have at least 90 customers in common.[20]

In response, defendants point out that many of the allegedly shared customers have not purchased any products or services from plaintiff since January 2010. Defendants

---

[20] Fabick has also developed an epoxy coating, which is sprayed on top of the crushed aggregate placed on roundabouts, slopes under bridges, highway embankments and along waterways. The product has been sold to the State of Wisconsin and municipalities to be used in road construction projects. Plaintiff represents that for such projects, Fabick previously has been on the same job site as FABCO. (*See also* Pl.'s PFOFs (dkt. #93) ¶¶ 118-19.)

further contend that the "extent of the overlap between the customers is less than 3%." (Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 139.) While Fabick purports to dispute this calculation, it offers no basis for the dispute. (Pl.'s Reply to PFOFs (dkt. #175) ¶ 139.) Even so, the parties' shared customers in Wisconsin include Epic Corp., University of Wisconsin-Madison, Tri-North Builders, the Wisconsin Department of Corrections, the Dane County Regional Airport, Dane County, City of Madison, Capital Underground, McFarlane Manufacturing Co., Oil Equipment Company, Inc., and Monroe Truck Equipment.

Under Jay's ownership since 1997, Fabick has also continued to market to defendants' customers and to the same industry groups served by defendants.[21] As detailed further in plaintiff's proposed findings of facts, Fabick and defendants have marketed their respective products in the same magazines, engaged in similar radio and television ad campaigns, and attended the same trade shows. (See Pl.'s PFOFs (dkt. #93) ¶¶ 131-36.) Defendants do not dispute that the parties may share advertising strategies, but point out that Fabick has provided no proof of recent advertising; and more specifically, it has no advertising expenses in 2015. (Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 130.)

Here, plaintiff has put forth evidence to demonstrate that both parties' business is focused in Wisconsin, they use (or, at least, historically have used) the same marketing channels, and have some overlapping (again, perhaps, just historically) customers. Still,

---

[21] When referring to "defendants" collectively, the court recognizes that FABCO ceased operating on June 30, 2015. As such, any reference to customers or advertising strategies necessarily refers to FABCO for the period preceding July 1, 2015, and JFTCO thereafter.

factual issues remain as to whether Fabick and JFTCO currently share these same customers and channels, or have post July 2015, and again the *weight* to be placed on this factor, if any.

### D. Degree of Care

In considering this factor, the court "must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (internal quotation marks omitted). "The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc.*, 267 F.3d at 683. Moreover, "the lower the degree of ordinary care, the greater likelihood of confusion, and vice versa." Richard L. Kirkpatrick, *Likelihood of Confusion in Trademark Law*, § 6:2, at 6-4 (May 2012). "Professional buyer are expected to be more discriminating and knowledgeable in making purchases and they may not be confused be the same similar marks as would likely confuse the ordinary, casual consumer." 4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:100 at 24-413 (4th ed. 2017).

In a typical trademark infringement claim, the confusion at issue is "forward confusion," where "customers mistakenly think that the junior user's good or services are from the same source as or are connected with the senior user's good or services." *Sands, Taylor & Wood Co.*, 978 F.2d at 957. "Forward confusion" in this case would manifest itself as the consuming public believing that JFTCO's sale, rentals and servicing of

Caterpillar equipment is connected with Fabick's coating and sealant business. While plaintiff contends that it has suffered some instances of forward confusion, the "primary thrust of Fabick's case lies in the doctrine of "reverse confusion," which occurs "when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user." (Pl.'s Br. (dkt. #91) 10 (citing *Sands, Taylor & Wood*, 978 F.2d at 957).) Here, plaintiff contends and presents evidence detailed below of confusion on the part of consumers, assuming that Fabick's sealants and coatings is the same or related to JFTCO's business. In such a reverse confusion case, "the junior user does not seek to profit from the good will associated with the senior user's mark." *Sands, Taylor & Wood*, 978 F.2d at 957. "Nonetheless, the senior user [may be] injured because . . . it loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id*. (internal citation and quotation marks omitted).

With that framework in mind, it is not clear that the degree of care factor supports plaintiff's infringement claim. In an attempt to bolster its position with respect to this individual factor, Fabick points to the low cost of some daily rentals and Caterpillar parts in an apparent attempt to downplay the importance of the purchase decision and therefore the degree of care exercised by the consuming public. There appears no dispute, however, that JFTCO's customers are sophisticated, professional buyers of expensive products and services.

Plaintiff also argues that the level of sophistication among professional buyers varies greatly, specifically directing the court to the declaration of Keith Walsh, a sales manager

for one of Fabick's primary outside applicators, who apparently believed that Fabick's spray-on truck bedliners were produced by the company "off the beltline," referring then to JFTCO. Based on this, plaintiff argues that evidence of confusion among individuals working in sales is strong evidence of consumer confusion more generally. (Pl.'s Opp'n (dkt. #147) 56 (citing *Polo Fashions, Inc. v. Extra Special Prods., Inc.*, 451 F. Supp. 555, 562 (S.D.N.Y. 1978)).) Putting aside defendants' challenges to Walsh's declaration, which came to light during his deposition, the record reflects that JFTCO's customers exert significant care in their purchase decision.

In light of the degree of care exercised by JFTCO's customers and the odd application of this factor in a reverse discrimination claim, the court is certainly inclined to weigh this factor in favor of defendants, not so heavily as to find that it warrants summary judgment in either party's favor, although the likelihood that plaintiff has generally benefitted from any lack of care by customers again makes this a close call.

### E. Strength of Plaintiff's Mark

"The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE, Inc.*, 267 F.3d at 684. Marks that are widely recognized merit greater protection from the courts. *See, e.g.*, *Nike, Inc. v. Just Did It Enterprises*, 6 F.3d 1225, 1231 (7th Cir. 1993). In assessing mark strength, the court must first determine to which category the mark belongs. *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1170 (7th Cir. 1986).

Here, the Fabick mark is a surname, which would typically be categorized as descriptive, on the spectrum from generic, descriptive, suggestive, arbitrary and fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)). Generic terms or phrases are entitled to no protection; suggestive, arbitrary and fanciful phrases are always entitled to trademark protection; and descriptive phrases are "generally not protectable as trademarks," but become protectable if the marks "acquire[] secondary meaning." *Mil-Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1157 (7th Cir. 1996) (alteration in original).

Moreover, defendants put forth significant, undisputed evidence that the Fabick name is used broadly by Jay Fabick and other family members in various businesses ventures. For example, on May 24, 2006, Jay, Jack and James Fabick formed Fabick Equipment, LLC. (Jack and James are two of Jay and Jeré's brothers.) Fabick Equipment, LLC was a distributor of Hyundai construction equipment, though apparently the entity only sold three machines. Fabick Equipment utilized the web address www.fabick.net and had officers in Fabick's building located in Madison, Wisconsin. Other Fabick family companies that have operated or currently operate in Wisconsin using the FABICK Mark include Fabick Lawn Care, Fabick Marketing, Fabick Design, and The Fabick Farm. Plaintiff has not produced any licensing agreements or any documents suggesting that these entities paid royalties to plaintiff for use of the Fabick name.

From this, a reasonable fact finder would likely conclude that the Fabick mark is weak, though plaintiff contends that the mark is "strong" with respect to its customers

without citing any support.[22]   Because this case primarily concerns reverse confusion, however, "it may make more sense to consider the strength of the mark in terms of its association with the junior user's goods." *Sands, Taylor & Wood*, 978 F.2d at 959.   In other words, the jury will need to consider the relative strength of the "Fabick CAT" mark vis-à-vis the smaller presence of the FABICK mark.   Here, plaintiff contends that the JFTCO's size, extensive advertising campaign and incorporation of the CAT mark, when compared to the small Fabick, overwhelms the presence of Fabick.

At the end of the day, the relevance of this particular factor is also unclear, but certainly appears limited.   Regardless, it does not carry the day for either party in establishing or disproving a likelihood of confusion.

### F.  Evidence of Actual Confusion

"There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Int'l Kennel Club*, 846 F.2d at 1089 (quoting *World Carpets, Inc. v. Dick Littrells New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)).   If available, this evidence is "entitled to substantial weight" in the overall analysis.   *CAE, Inc.*, 267 F.3d at 685.

Here, plaintiff puts forth significant evidence of confusion, which largely stands undisputed, although defendants challenge its admissibility.   As best as the court can

---

[22] There appears to be no dispute that plaintiff has made minimal attempts to promote its mark more broadly since JFTCO's use of the Fabick CAT mark.  As previously noted, plaintiff spent $681.78 on advertising expenses in 2016, as reflected on its income statements, though plaintiff contends that this does not include trade show and demonstration expenses, among other related costs.  According to its income statements, plaintiff had no advertising expenses in 2015.

discern, though plaintiff fails to actually explain its process, four or five employees of plaintiff logged instances of confusion since July 1, 2015. In contrast, Jay Fabick represents that "[b]etween December 21, 1997, and June 30, 2015, Fabick, Inc. never experienced any confusion from customers, vendors, employees, or others regarding any connection, affiliation, association, or ownership relationship between Fabick, Inc. and FABCO." (Pl.'s PFOFs (dkt. #93) ¶ 201 (citing Jay Fabick Decl. (dkt. #105) ¶ 39).)[23]

In her declaration, Elizabeth Fabick, General Counsel of Fabick, Inc., apparently compiled the instances of confusion, based on other employees logs. (Elizabeth Fabick Decl. (dkt. #97) ¶¶ 6-13.) Elizabeth also avers that "she sometimes answers the phone at Fabick, Inc.," and lists seven calls she personally received from individuals who were calling for JFTCO. (*Id.* at ¶¶ 14-21.) Other Fabick employees submitted similar declarations, recounting their personal experiences with calls, visits and mail received from individuals who believed they were contacting JFTCO. (Steven Fabick Decl. (dkt. #103) ¶¶ 23-58 (describing mail, invoices and parts received in error; calls from confused vendors, customers and third-parties; and other instances of confusion); Michael Fabick Decl. (dkt. #96) ¶¶ 3-7 (describing calls received in error); Jay Fabick Decl. (dkt. #105) ¶¶ 40-42

---

[23] Defendants challenge this and other of plaintiff's proposed findings of fact as to whether this statement is made solely based on Jay's personal knowledge under Federal Rule of Evidence 602 and whether Jay's memory is reliable. (Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 201.) The first challenge is simply a requirement of all witnesses: that he limit his testimony to personal knowledge, but in light of Jay's history with plaintiff and his long-standing role as President, Jay may offer this testimony based on personal knowledge: he never encountered, nor was told of confusion. The second challenge simply goes to weight and will no doubt be the subject of robust cross examination.

(describing instances of confusion); Joseph G. Fabick, III Decl. (dkt. #101) ¶¶ 34, 38-43 (describing instances of confusion).)

The declaration of the other Fabick employees provide support for Elizabeth's compilation, at least for purposes of summary judgment. Moreover, the declarants' statements about what other individuals said are admissible under Federal Rule of Evidence 803(3), to show customer confusion. *See, e.g.*, *Comp-U-Tronix Discount Radar Detectors, Inc. v. Landmark Electronics Co.*, No. 90 C 6582, 1991 WL 236877, *3 (N.D. Ill. Oct. 30, 1991) (denying motion to strike affidavits "where employees state conversations which took place with customers" under Rule 803(3)); *Source Servs. Corp. v. Source Telecomputing Corp.*, 635 F. Supp. 600, 612 (N.D. Ill. 1986) ("To the extent that the reported statements of the members of the public identified therein can be considered hearsay, the statements are admissible under Fed. R. Evid. 803(3) as a statement of the declarant's then existing state of mind, i.e., the declarant's confusion as to the source of 'The Source.'" (internal citations and footnote omitted)). Defendants, of course, are free to cross-examine Elizabeth and the other Fabick employees about their conversations with would-be customers of JFTCO, but the court sees no reason to disregard this evidence at summary judgment or generally exclude it from trial.[24]

From this evidence, plaintiff claims that since July 1, 2015, it has received 104 phone calls from customers, vendors, JFTCO employees and others, where a caller reached Fabick mistakenly, apparently believing he or she was contacting JFTCO; received 67

---

[24] The admissibility of Elizabeth's compilation of other employee logs may be a closer question at trial.

shipments or pieces of mail, including parts, payments and invoices, which were intended for JFTCO but mistakenly sent to Fabick, including instances where the mistaken delivery was from a shared customer; received a handful of instances where a Fabick customer mistakenly sent a check to JFTCO; had a customer or vendor of either Fabick or JFTCO go to the wrong location on at least eight occasions, thinking that Fabick's location was JFTCO's, or vice versa;[25] and experienced seven instances of Fabick's account with a vendor or others, either being changed to reflect an association with JFTCO, being combined with JFTCO's account, or otherwise updated to reflect JFTCO's address as Fabick's.[26]  ((Pl.'s PFOFs (dkt. #93) ¶¶ 213-259.)  Fabick was also mistakenly named as a defendant in place of the John Fabick Tractor Company in a small claims lawsuit.  (*Id.* at ¶ 249.)

Defendants argue plaintiff's records of wrong calls "simply show that the caller dialed the wrong number, quickly realized that they reached the wrong entity, hung up and, presumably re-directed their call."  (Defs.' Add'l PFOFs (dkt. #173) ¶ 271.)  This argument, however, simply supports a finding that any confusion was quickly resolved, not

---

[25] Plaintiff also submitted a declaration of one confused visitor, Keith Walsh, the sales manager for Madison Auto Trim for the last one and half years, one of Fabick's customers.  (Walsh Decl. (dkt. #95).)  In his declaration, Walsh explains that he tells his customers that Fabick is the "company on the beltline," mistakenly referring to Fabick CAT.  (*Id.* at ¶¶ 8-9.)  Defendants seek to supplement the record after having had a chance to depose Walsh.  (Dkt. #200.)  Specifically, defendants contend that his deposition testimony undercuts any finding that Walsh is a "sophisticated buyer."  (*Id.* at 2 (testifying at his deposition that he is not involved in purchasing at Madison Auto Trim).)  While the court will grant the motion to supplement, Walsh's confusion and whether he constitutes a sophisticated buyer does not tip the balance, in either direction, in determining whether to grant summary judgment.  Of course, the parties are free to present their respective positions on Walsh's confusion at trial.

[26] Defendants dispute the cause of some of these instances of confusion, arguing that any confusion with respect to Fabick's business identity is because of Fabick's own laxness in monitoring business services records.  (*See, e.g.*, Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 294.)

that there was no confusion in the first instance. What defendants are really arguing is that plaintiff cannot show lost sales because of the confusion, or much injury of any kind. For the most part, plaintiff does not dispute this, again pursuing a reverse confusion theory of infringement, whereby the public believes that Fabick is in the business of selling and renting heavy equipment, not that the public believes JFTCO is in the business of selling coatings and sealants. Defendants' criticism of this evidence is certainly relevant to a determination of damages, but it does not rebut a finding of actual confusion. On the undisputed record at summary judgment, therefore, a finding of likelihood of confusion is supported, but again the weight the jury may place on this factor, especially coupled with the lack of any apparent intent to infringe, precludes granting judgment in plaintiff's favor.

One final word on this actual confusion factor. In support of its motion, Fabick attempts to support a finding of actual confusion based on what it claims is a slowdown in its epoxy business. Fabick assumed that this business would grow in 2016 and 2017, but instead Fabick received no calls or requests for proposals for epoxy work through the first four months of 2017. As defendants point out, however, plaintiff's own sales records since *2010* reflect only a single slope-paving project for April and none for January through March. Plaintiff explains this work cannot be completed during the winter months, but acknowledges that it does bid out paving jobs during those months. (Defs.' Resp. to Pl.'s PFOFs (dkt. #150) ¶ 122; Pl.'s Reply to PFOFs (dkt. #175) ¶ 122.) Moreover, regardless of what plaintiff actually experienced (and is currently experiencing) in terms of a slowdown in its business, plaintiff puts forth *no* evidence that would support a finding that the alleged trademark infringement *caused* that slowdown. In other words, a jury could

only speculate that calls seeking bids for Fabick's epoxy work were being deferred because of customer confusion with JFTCO. In fact, the evidence would appear to go the other way. On this record, therefore, the court places no weight on the epoxy business theory; and absent proof of causation, it will preclude plaintiff from pursuing this theory at trial.

### G. Defendant's Intent

Finally, the court must consider defendant's intent, although "[a] finding of fraudulent intent or bad faith is not essential to prove infringement where likelihood of confusion already exists." *Henri's Food Prods.*, 717 F.2d at 359. Rather, the court can infer likelihood of confusion "when there is proof of intentional copying because then 'the adoption itself indicates that defendants expected that likelihood to their profit.'" *Id.* (quoting *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 613 (7th Cir. 1965)). "[I]f the infringer thinks [consumers] will be confused that is some evidence they will be." *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986). Mere *knowledge* of the senior user's mark, however, is not enough to show intent on the part of the alleged infringer. *See Barbecue Marx*, 235 F.3d at 1046.

FABCO and the John Fabick Tractor Company desired for both the Missouri/Illinois and Wisconsin/Michigan territories to operate under the same identity. One reason for choosing the FABICK CAT identity for the combined dealership was that the John Fabick Tractor Company, which operated under the FABICK CAT identity, was the acquiring party. (As plaintiff points out, JFTCO is the acquiring party, but the John Fabick Tractor Company is the sole owner of JFTCO.) The name was also selected because of the over half a century history behind the Fabick name, as compared to the FABCO name, though

plaintiff points out that the John Fabick Tractor Company did not begin operating under the FABICK CAT mark until at least 2002. Putting aside the dispute as to whether FABCO was actually aware of plaintiff's marks, there also appears no basis for a reasonable jury to find that defendants ultimately adopted the Fabick CAT mark with an intent to infringe Fabick trademarks or otherwise palm off its goods and services as Fabick's.[27]

In considering all of these factors, the court concludes that evidence of actual confusion weighs heavily in favor of plaintiff, but the other factors are either a wash, weigh in favor of defendants, or turn on fact issues (*e.g.*, salient portion of the mark in assessing similarity or overlap in customers and marketing channels, among other discrete factual disputes). As such, the court will deny the parties' cross motions for summary judgment as to likelihood of confusion.

## IV. Unclean Hands Defense

In the trademark infringement context, a plaintiff's unclean hands can bar equitable relief. *See generally* 6 J. Thomas McCarthy, *McCarthy on Trademarks* § 31:44 (4th ed. 2017). "'[U]nclean hands' really just means that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to." *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985). Here, defendants assert

---

[27] Plaintiff's General Counsel Elizabeth Fabick avers that she contacted JFTCO in late 2015 and early 2016, expressing concerns over the use of the "Fabick" name and specifically identifying several instances of confusion, but JFTCO refused to stop using the name. Even assuming this supports a finding of intent at the time defendants decided to use the Fabick CAT brand name, plaintiff did not seek a preliminary injunction. Moreover, defendants put forth evidence that once they became aware of the instances of confusion, they attempted to address concerns through education efforts, including requiring their employees always to use "Fabick CAT" (rather than just the "Fabick") mark, and it redirected calls to Fabick. (Defs.' Add'l PFOFs (dkt. #153) ¶¶ 282-86.)

two discrete unclean hands defenses: (1) Jay signed declarations in support of the trademark and service mark applications in which he averred that he was not aware of the use of the claimed mark by others; and (2) Jay transferred the trademarks from Fabick, Inc., to a shell LLC without FABCO's authorization.

With respect to the *first* challenge, on March 22, 1994, Jay signed a declaration in support of Fabick, Inc.'s trademark application, as President of Fabick, and filed it with the United States Patent and Trademark Office. In the declaration, Jay certified that

> no other person, firm, corporation, or association, to the best of his or her knowledge or belief, has the right to use such mark in commerce either in the identical form of the mark or in such near resemblance to the mark as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive, and that all such statements made of his or her own knowledge are true and all statements made on information and belief are believed to be true.

(Defs.' Add'l PFOFs (dkt. #153) ¶ 119 (Schroeder Decl., Ex. C (dkt. #125-3) 28).) Jay filed another declaration, also in his capacity as President of Fabick, in support of the service mark application, in which he made the same certification. (*Id.* at ¶ 128-29 (citing Schroeder Decl., Ex. T (dkt. #125-20) 34).) Fabick also did not disclose the existence of the John Fabick Tractor Company -- or the use of the "Fabick" name in connection with its Caterpillar dealership -- to the USPTO during the prosecution of either the trademark or the service mark.

At the time he signed the declaration, Jay was aware that the John Fabick Tractor Company used the stylized "F" mark, as depicted above (*see supra* Opinion § II). (Pl.'s Resp. to Defs.' Add'l PFOFs (dkt. #173) ¶ 121 (citing Jay Fabick Dep. (dkt. #69) 116-17;

Defs.' Add'l PFOFs' (dkt. #153) ¶ 122 (citing Borlinghaus Decl. (dkt. #134) ¶ 21).) As previously discussed, Jay's knowledge of the use of the Fabick mark is hardly surprising given his history with the John Fabick Truck Company: Jay first worked for the John Fabick Truck Company in high school; held stock in the company before his interest was transferred to FABCO stock; and may even have used equipment supplied by the John Fabick Tractor Company and its subsidiaries when he was a heavy equipment operator himself on the Alaska Pipeline in the mid-1970s. Moreover, Jay worked for the John Fabick Tractor Company as a sales trainee in Fenton, Missouri from May 1976 to January 1977 and as a sales representative for one of its subsidiaries in Sikeston, Missouri, from February 1977 until he was terminated on August 17, 1981. The Fabick name was displayed prominently on the Sikeston building of the John Fabick Tractor Company where Jay worked. From these facts, defendants argue convincingly "[e]ither the representation Jay Fabick made to the United States Patent and Trademark office is true, in which case there is no likelihood of confusion, or he falsely represented the state of the market to acquire his registrations." (Dkt. #119.)

*Second*, in November 1997, Jay was informed that Fabick, Inc., was closing and that his employment with FABCO would end. On December 19, 1997, Jay created an entity named J.G. Fabick, L.L.C. ("J.G. Fabick"), which was held out as a "real estate holding company," though Jay testified at his deposition that he could not recall if it ever owned any real estate. (Pl.'s Resp. to Defs.' Add'l PFOFs (dkt. #173) ¶ 145.) The operating agreement provides that the management "shall be vested in its sole member," and "Joseph G. Fabick, Jr. is the sole initial Member of the Company." (Defs.' Add'l PFOFs (dkt. #153)

¶¶ 146-47 (citing Schroeder Decl., Ex. VV (dkt. #165-1) 1, 6).)  On that same day, Jay transferred the Fabick trademark and service mark to J.G. Fabick.

Plaintiff does not dispute any of this, but instead argues confusingly that (1) J.G. Fabick gave Fabick, Inc., an implied license to use the Fabick mark, *or* (2) Fabick, Inc., actually retained the goodwill associated with the mark.  Thus, plaintiff goes on, there was "no transfer because it was an invalid assignment in gross."  (Pl.'s Resp. to Defs.' Add'l PFOFs (dkt. #173) ¶ 148).)  At that time, while Jay was president, FABCO owned 75% of Fabick stock and Joe owned the other 25%.  Moreover, there was no formal authorization by Fabick, Inc., to transfer the intellectual property to J.G. Fabick.  Defendants further contend that Jay was not authorized to transfer the intellectual property owned by Fabick, Inc., though plaintiff disputes this based on Jay's position as president at that time.

At his deposition, other than mentioning that his action was probably recommended by an attorney, which the court disregards in light of plaintiff's invocation of the attorney-client privilege, Jay could offer *no* explanation for this transfer (Pl.'s Resp. to Defs.' Add'l PFOFs (dkt. #173) ¶ 153; 10/5/17 Order (dkt. #215)), although a reasonable inference in that Jay hoped to still control the mark should Fabick, Inc., be dissolved, rather than have it revert back to FABCO.  On July 8, 2002, J.G. Fabick, L.L.C. transferred the Fabick marks back to Fabick, Inc., also without explanation.[28]  During the time J.G. Fabick owned the marks, Fabick continued to hold itself out as owning the mark, entering into various

---

[28] Defendants point out that the transfer back to Fabick occurred shortly after the resolution of a lawsuit involving some of the same parties.  In 2000, after Jay had left FABCO's employment and obtained 100% of Fabick's stock, Jay and two of his brothers filed a lawsuit against FABCO, Joe, Jeré, Caterpillar, Inc. and FABCO's Board of Directors.  The lawsuit was settled on June 13, 2002.

licensing agreements with dealers under which it purported to transfer intellectual property rights in the mark to those dealers.

Relying on statements by Jeré and Tom Svetnicka, defendants also contend that "[a]t the time of the stock transfer agreement, FABCO was not aware that Jay Fabick had registered "Fabick" as a trademark or service mark in Fabick, Inc.'s name." (Defs.' Add'l PFOFs (dkt. #153) ¶ 131.) In disputing this, plaintiff persuasively points to records showing that FABCO's CEO Joe and its marketing manager Svetnicka were *both* involved in the original discussions about registering Fabick's name, and they were aware of Fabick obtaining the registrations, as well as FABCO paying the associated attorneys' fees in it doing so. (Pl.'s Resp. to Defs.' PFOFs (dkt. #173) ¶ 131.)

Because this defense seeks equitable relief (or perhaps more accurately the denial of equitable relief), the court assumes that it is a question for the court, and not for the jury. The parties, however, fail to provide any guidance. Regardless, the court concludes that the merits of this defense cannot be decided at summary judgment. With respect to the *first* basis, the defense touches on the jury's determination as to whether the John Fabick Tractor Company's earlier use of the Fabick mark constitutes prior use. If the jury finds that the mark is somehow distinct from the Fabick mark adopted by plaintiff, then that finding would appear to undercut defendant's contention that Jay's representation was false. Similarly, if the court finds that JFTCO established prior use of the Fabick mark, then plaintiff's trademark claims fail, and the court need not take up an unclean hands defense. Even putting aside the relationship between this defense and the jury's

determination of prior use, the defense also requires *intent* on the part of Jay that is best assessed through live testimony.

As for the *second* basis for the defense, while Jay's conduct may have constituted malfeasance, defendants fail to offer a "direct nexus" between the alleged bad act of transferring the trademarks to a shell LLC and the trademark infringement plaintiff seeks to enjoin. *See Shondel*, 775 F.2d at 869 (7th Cir. 1985) (quoting *Int'l Union, Allied Industrial Workers v. Local Union No. 589*, 693 F.2d 666, 672 (7th Cir. 1982)). In other words, defendants fail to offer a plausible explanation as to how Jay's transfer of the trademarks in 1997 and subsequent return to plaintiff in 2002 is directly connected to the relief plaintiff now seeks.[29] Even assuming the nexus requirement can be satisfied, moreover, the court would again benefit from hearing Jay's testimony live and assessing his credibility before considering equitable relief, if any.

As such, the court will deny defendants' motion for summary judgment. The parties should be prepared to present any testimony and exhibits specific to this defense outside of the presence of the jury during the course of the trial.

## V. Abandonment

Even if not material for purposes of defendants' unclean hands defense, this does not put an end to the possible importance of Jay's transfer of the Fabick marks to J.G.

---

[29] Indeed, it is unclear what harm, if any, was done by Jay's action, since in the end FABCO and Joe both agreed to transfer all the stock of FABCO to Jay as part of a settlement and he ended up in control of the mark anyway. On the other hand, there is a strong case for finding the required nexus between the alleged misrepresentations in Jay's declaration to the USPTO effectively denying the John Fabick Tractor Company the benefit of its prior use of the Fabick name.

Fabick, L.L.C., on December 19, 1997, since that entity then held the marks for four and a half years until July 2002. On this basis, defendants argue separately that the undisputed record demonstrates that J.G. Fabick did not use the mark during that time and, therefore, the marks were abandoned under 15 U.S.C. § 1114(a). If so, plaintiff's claims under the Lanham Act would be meritless, since the Act only applies to registered marks.

"[A]bandonment of a mark is an affirmative defense to a trademark infringement action." *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1214 (7th Cir. 1997) (citing 15 U.S.C. § 1127). The Lanham Act provides that a mark has been abandoned "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. Furthermore, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment." *Id.*; *see also Specht v. Google, Inc.*, 747 F.3d 929, 934 (7th Cir. 2014) (explaining that after three years of nonuse, a rebuttable presumption of abandonment arises). "Once a mark is abandoned, it returns to the public domain and may be appropriated anew." *Specht*, 747 F.3d at 935. Furthermore, Fabick cannot reclaim its rights by using the marks after they were transferred back in 2002. 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 17:2 at 17-8 (4th ed. 2017) ("Rights lost as a result of abandonment are not revived by such subsequent use.") (citing *AmBrit, Inc. v. Kraft, Inc.*, 805 F.2d 974 (11th Cir. 1986)).

In response to defendants' assertion of abandonment, plaintiff contends that "[f]rom its inception to the present day, Fabick has at all times used and continues to use the FABICK marks within the coatings and sealants industry." (Pl.'s PFOFs (dkt. #93) ¶ 84 (citing Jay Fabick Decl. (dkt. #105) ¶ 27).) As for the transfer of the marks to J.G.

Fabick, plaintiff argues it was without any legal consequence because Jay Fabick controlled the marks at all times and, in the alternative, the court could find an implied license between J.G. Fabick and Fabick during that four year period.  (Pl.'s Opp'n (dkt. #147) 74 (describing test for implied license).)

Admittedly, because of Fabick's undisputed continued use of the FABICK mark, this is not a typical abandonment case.   Indeed, defendants argue that J.G. Fabick abandoned the marks during the relatively short period of time when it owned the marks and despite authorizing Fabick's continued use, whether formally licensed or not. Curiously, as defendants point out in their reply, plaintiff defended against defendants' prior use defense by citing a decision that appears to rebut plaintiff's argument here that it can rely on its own use of the marks to defend against a claim of abandonment during the period in which J.G. Fabick owned the mark.  Specifically, in *Noble House,* TTAB held that the registrant's failure to use the mark itself constituted abandonment, even though its parent company used the mark during the relevant period of time.

> Furnco International Corporation, the parent company, authorized its subsidiary, the Respondent, to be the owner of the registration at issue. We have not forgotten that Furnco International Corporation is the owner of Respondent and that it could be argued that Furnco International Corporation owned the registration all along. But the application for registration and the subsequent statement of use was not filed by Furnco International Corporation. Furnco International Corporation chose to structure its business using a legally distinct subsidiary, which counts as a "person" under the Trademark Act.  Such a business structure may offer some advantages, but it also comes with some strictures, and the existence of a separate and distinct legal entity (e.g., in this case a limited liability company) cannot be turned on or off at will to suit the occasion.

*Noble House*, 2016 WL 3357265, at *10.

As the *Noble House* decision explained, for Fabick to rely on its use during the time period in which J.G. Fabick, L.L.C. owned the mark, it would have to demonstrate that the two entities are "related companies" as that term is defined under 15 U.S.C. § 1127. 2016 WL 3357265, at *10 (also citing 15 U.S.C. § 1055 (providing that use by related company inures to benefit of registrant)). Section 1127, in turn, provides that "[t]he term 'related company' means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." In light of Jay Fabick's total control of both entities for most, if not all, of the claimed period of abandonment, the evidence would strongly suggest that Fabick and J.G. Fabick are "related parties" as a matter of law, especially in light of the fact that a heightened standard of proof likely governs this defense. *See* 3 *McCarthy on Trademarks* § 17:12 at 17-25 to 17-26 ("The majority of courts have interpreted the 'strictly proved' rule to mean that evidence of the elements of abandonment must be clear and convincing.").

Still, given the uncertainty left in the wake of *Noble House* and the limited significance of this defense, because it would only foreclose plaintiff's claim under § 1114, the court will simply deny defendants' motion as to its abandonment defense, rather than take up the possible entry of summary judgment in plaintiff's favor *sua sponte*.

## VI. Fair Use

Title 15 U.S.C. § 1115(b)(4) sets forth an affirmative defense where "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." "To prevail on the fair use defense, defendants must show that: (1) they used ["Fabick"] in a non-trademark use; (2) the phrase is descriptive of their goods or services; and (3) they used the phrase 'fairly and in good faith' only to describe their goods or services." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001)

Plaintiff's motion for summary judgment on defendants' fair use defense is premised on a mishmash of theories, but appear to come down to the following: (1) FABCO never used the Fabick mark, except with respect to Fabick, Inc., and transferred any arguable rights in Fabick by transferring the stock in Fabick, Inc., to Jay Fabick in 1997; and (2) any purported subsequent sale of FABCO's fair use or other rights of the Fabick mark to JFTCO is actually grounds for finding infringement. In response, defendants clarify that -- consistent with the limits of the defense -- FABCO *never* claimed a right to use the Fabick name other than "to show affiliation to the Fabick family, and lineage to John Fabick, Sr., who founded the first Fabick Company in 1997." (Defs.' Opp'n (dkt. #146) 65.) As to that, there appears to be no dispute that FABCO used the Fabick name to reference this history and familial connection. (Pl.'s Br. (dkt. #91) 55 (acknowledging that FABCO used the Fabick name to reference the family history).) In other words, defendants are not

attempting to assert a fair use defense to rebut plaintiff's infringement claim with respect to JFTCO's use post July 2015.

This then moots plaintiff's second basis for summary judgment on this defense -- that FABCO transferred its right to use the Fabick name to JFTCO as part of the sale of its assets. Regardless, the APA and Schedules rebut any claim that FABCO sold purported rights to the FABICK marks to JFTCO. Section 3.19 of the APA sets for the intellectual property assets that were transferred to JFTCO. "Fabick" does not appear on that schedule. (Defs.' Add'l PFOFs (dkt. #153) ¶¶ 187-89 (also noting that APA contains a merger clause).)

Since FABCO's invocation of the defense is very narrow, limited to its use of the Fabick name for purposes of pointing out lineal, family history, the practical implications of this defense are unclear, the court sees no basis to grant plaintiff's motion for summary judgment, though defendants may not assert a fair use defense that extends beyond that articulated in opposition to plaintiff's motion.

## VII. Monetary Damages

Finally, defendants seek summary judgment on any claim for monetary relief. Defendants contends that plaintiff has failed to put forth evidence that it has suffered damages as a result of defendants' alleged infringement, much less attempt to provide a computation of each category of damage as required under Federal Rule of Civil Procedure

26(a)(1)(A)(iii).[30]  In its motion, defendants also run through the full gambit of possible damages theories, arguing that none fit the facts of this case.

The Lanham Act provides that a successful plaintiff may recover "(1) defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of the action." *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985) (citing 15 U.S.C. § 1117).  Taking them out of order, defendants contend that plaintiff "cannot identify customer or sales that it lost as a result of any alleged confusion," (*id.* at ¶ 272), and specifically points out that 2015 was plaintiff's best year and 2016 was its third best year.  Moreover, other than the alleged slowdown in the epoxy business, which the court addressed above in considering plaintiff's evidence of actual confusion (*see supra* Opinion § III.F), plaintiff has failed to put forth any theory to support a damages award based on lost sales.

Still, there are other bases for awarding damages based on plaintiff's injuries.  For example, the evidence of actual confusion supports a finding that plaintiff spent time dealing with such confusion, diverting its employees from its core business.  Plaintiff need not put forth evidence that it had to hire additional employees to deal with these instances or other evidence of out-of-pocket expenses.  Instead, a jury reasonably could fashion an award based on employees hours spent on addressing instances of confusion, coupled with opportunity costs associated with that time.

---

[30] The court agrees that anything that was not timely disclosed under Rule 26(a)(1)(A)(iii) cannot be sought at trial, but it is difficult to discern what has been disclosed under that rule and will expect plaintiff to set forth precisely when and what it disclosed as to its damages claims at the final pretrial conference.

Furthermore, plaintiff may also be entitled to damages based on alleged harm to plaintiff's goodwill. *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) ("In measuring harm to goodwill, a jury may consider a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts."). Here, plaintiff contends that it has spent $740,000 in advertising expense since its inception. Of course, plaintiff will need to prove this amount or otherwise provide evidence to support a finding of the value of its goodwill. Plaintiff will also have to demonstrate that plaintiff's goodwill was injured by defendants' infringement, but the court finds no reason to cut off this possible avenue of damages at the summary judgment stage.

The same cannot be said of plaintiff's claim to an award of damages based on defendants' profits. Here, the court agrees that plaintiff has offered nothing to support such an award. While plaintiff states in its opposition brief that a defendant's profits may be awarded (Pl.'s Opp'n (dkt. #147) 88), it fails to develop any theory as to why such an award would be appropriate here, much less evidence supporting its award. On the contrary, as already noted in discussing plaintiff's reverse confusion theory, the court is hard-pressed to understand *how* defendants were unjustly enriched by consumers assuming that Fabick's sealants and coatings business is the same or related to JFTCO's business.[31]

All of the other relief raised in this portion of defendants' motion turns on the court's determination of the equities (e.g., corrective advertising), including considerations

---

[31] Similarly, the court also rejects plaintiff's claim to any damages based on FABCO's purported transfer of the FABICK mark as part of the asset purchase sale to JFTCO for the reasons provided earlier in the opinion. (*See supra* Opinion § VI.)

where the court would benefit from a more complete record before issuing a decision (e.g., the basis for punitive damages). As such, the court will deny defendants' motion for summary judgment that plaintiff has *no* basis for an award of monetary damages, though restrict its claim to such damages as set forth above.

## ORDER

IT IS ORDERED that:

1) Plaintiff Fabick, Inc.'s motion for summary judgment (dkt. #90) is DENIED.

2) Defendants FABCO Equipment, Inc., and JFTCO, Inc.'s motion for summary judgment (dkt. #117) is GRANTED IN PART AND DENIED IN PART. The motion is granted as to plaintiff's claim of direct infringement against defendant FABCO. In all other respects, the motion is denied.

3) Plaintiff's motion to strike answers to amended complaint (dkt. #195) is DENIED.

4) Defendants' motion for leave to file supplemental responses (dkt. #200) is GRANTED.

5) The previously reserved portion of defendants' motion to compel discovery or, alternatively, to preclude evidence and argument at trial and strike plaintiff's reliance on advice of counsel in its summary judgment briefing (dkt. #211) is GRANTED. Plaintiff is directed to produce promptly the "first category" of documents identified in the court's prior order (dkt. #215) and filed *ex parte* by plaintiff (*see* dkt. #219).

Entered this 8th day of November, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge